## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| ORLANDO SMITH, | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | **CIVIL ACTION** |
| | : | **No. 15-4913** |
| COMHAR, INC., | : | |
| Defendant. | : | |

**MCHUGH, J.**                                                    **March  9, 2017**

## MEMORANDUM

This is an unusual Title VII case, both because it concerns a sex discrimination claim by a male plaintiff, and because that plaintiff was a manager who now alleges that he was fired largely due to the actions of employees whom he supervised.  According to Plaintiff, these employees objected to working for a male boss and therefore waged a campaign of misinformation and insubordination in an attempt to get him fired.  Plaintiff further maintains that his employer, Defendant COMHAR, was complicit in this effort, leading to his termination.  Alternatively, Plaintiff argues that Defendant fired him because he filed a sex discrimination complaint.  Because the record contains marginal if any evidence of discriminatory animus or retaliatory intent, and because Plaintiff fails to rebut Defendant's non-discriminatory rationale for his termination, Defendant's Motion for Summary Judgment is granted and Plaintiff's claims are dismissed.

## I.      UNDERLYING FACTS

Defendant COMHAR is a nonprofit organization serving individuals with mental illness and with mental and physical disabilities.  Among other things, Defendant provides Targeted Case

Management services for those with "severe and persistent mental illness . . . who have overused psychiatric emergency services and experienced psychiatric hospitalization and/or homelessness." MSJ at 3.  In April 2014, Plaintiff Orlando Smith was promoted to the position of Targeted Case Management (TCM) Supervisor.[1]  In this capacity, he oversaw a team of six Case Managers, each of whom worked directly with around 30 clients.  The decision to hire Plaintiff was made by Catina Anastasiadis, who had previously served as TCM Supervisor before being promoted to TCM Director.  As TCM Director, Anastasiadis was Plaintiff's boss.

Plaintiff's tenure as TCM Supervisor got off to difficult start.  Within two weeks, he began having problems with two of his direct reports:  Tammy Hairston and Lori Mina.  These problems first arose in the context of daily morning team meetings.  Because Case Managers spend much of their time serving clients in the field, these meetings were the only regular opportunities for Plaintiff to interact with his entire team.  Plaintiff used the morning meetings to make announcements and to gather information about his team members' clients.

As early as his first week on the job, Plaintiff maintains that Hairston was insolent and uncooperative at morning meetings.  By way of example, Plaintiff claims that during at least one morning meeting, Hairston worked on an office computer instead of listening to her co-workers, did not look up from the computer screen when speaking to Plaintiff, and refused to provide additional information about her clients when Plaintiff requested it.  According to Plaintiff, Hairston's unpleasant and obstinate attitude carried over from morning meetings to their individual encounters.  For instance, Plaintiff claims that during one-on-one meetings, Hairston "sighed, eye rolled, and played with her cell phone . . . , and grudgingly gave limited information as I asked for a report on each client."  MSJ Ex. 4 at *81.  He also claims that Hairston routinely violated COMHAR

---

[1] It is not clear from the record what Plaintiff's position was prior to his promotion, or how long he held that position with Defendant.

2

procedures by failing to provide Plaintiff with her notes detailing client interactions, and that she delayed in complying with Plaintiff's directives.

Plaintiff claims that he did nothing to warrant Hairston's insubordination; rather, he says that Hairston defied him because she harbored a general disdain for men.  In support of this theory, Plaintiff proffers testimony from Kelli Seibert, a Case Manager at COMHAR, but not one of his direct reports.  According to Seibert, Hairston did not "like men.  So she treated all men like crap." Resp. Ex. A at 13.

Whatever caused Hairtson's hostile demeanor, Plaintiff eventually responded by admonishing her in front of her colleagues during morning meeting.  Mina took issue with Plaintiff's public rebuke.  In an e-mail to Plaintiff and his superior, Anastasiadis, Mina claimed that Plaintiff's poor facilitation resulted in chaotic morning meetings, and that Plaintiff had unfairly singled out Hairston for a reprimand when others were engaged in similarly disruptive behavior.

Prompted by Mina's e-mail and Plaintiff's complaints about Hairston, Anastasiadis intervened.  On May 5, 2014, she mediated meetings both between Plaintiff and Hairston and Plaintiff and Mina.  Plaintiff describes Anastasiadis as a passive participant in these meetings, but there is evidence that she reiterated to Hairston and Mina that Plaintiff was their supervisor, that the format and content of the morning meetings were matters committed to Plaintiff's discretion, and that Hairston was obligated to provide Plaintiff with information on her clients.

Any improvement following the May 5 meeting was fleeting.  Four days later, during the morning meeting on May 9, Plaintiff publicly reprimanded Mina for using her computer after he had expressly requested that team members refrain from doing so.  This reproach prompted Mina to again e-mail Plaintiff and Anastasiadis, and again accuse Plaintiff of selectively doling out demerits while ignoring other unruly behavior.

To Plaintiff's annoyance, Mina's habit of airing her grievances with Plaintiff in e-mails to Anastasiadis resurfaced less than three weeks later, on May 28.  On that day, Plaintiff was notified that one of Mina's clients was having a medical emergency.  Believing that Mina was in a meeting and therefore unavailable, Plaintiff "proceeded to seek coverage . . . based on the information available to me, using my judgment and discretion as supervisor."  Resp. Ex. F at *4.  Unbeknownst to Plaintiff, Mina had already arranged for another colleague to attend to her client.  Later that afternoon, Mina copied Anastasiadis on an e-mail to Plaintiff in which she criticized him for failing to call her before intervening with her client, and claimed that his failure to communicate had caused panic and confusion.  *Id.*

At or around this time, Plaintiff claims that Anastasiadis revealed to him that Hairston and Mina disagreed with her decision to hire Plaintiff as TCM Supervisor.  During his deposition, Plaintiff remembered his conversation with Anastasiadis this way:

> She said, I talked with the team before you were hired and let -- and I tried to keep them in the loop about who we were considering.  And she said, the only two people that had any problem were those two [(Hairston and Mina)] and it seemed to be about the men.  That was when gender came into it.  I mean, that's when--
> Q.    What does that mean, it seemed to be about the men?
> A.    Well, from what I understood, about the men she was considering for the job. She said . . . she was keeping the team abreast of who she was considering for the position. . . .  And I assume she was giving names or -- I think there was another gentleman that -- there was another case manager who applied.

Resp. Ex. B at 40.

Faced with what he perceived as insubordinate behavior by two employees who had apparently objected to his hire, Plaintiff attempted in late May to initiate more formal disciplinary action against Hairston and Mina.  At Anastasiadis's recommendation, Plaintiff drafted "Memos of Concern," documenting his grievances with each.  Also at Anastasiadis's recommendation, Plaintiff shared these memos with Tonica Lowe-Miller, Defendant's Assistant Director of Human Resources, and asked for her permission to send the memos to Mina and Hairston.  Because

4

Plaintiff had only been a TCM Supervisor for short time, Lowe-Miller withheld her permission and instead directed Plaintiff to verbally communicate his concerns to his team members.

Unhappy with Lowe-Miller's proposed approach, Plaintiff appealed for help to Michelle Feeney, Division Director for Intensive Behavioral Services and Anastasiadis's boss.   In an e-mail dated June 19, Plaintiff wrote to Feeney, apparently in reference to Hairston:  "I'm really sorry to bother you with this but I don't know what else to do.  I may have to ask you to intervene in helping myself and Catina with a personnel matter that we can't seem to fix."  Resp. Ex. C.  In response, Feeney directed Anastasiadis to meet again with Plaintiff and Hairston.

Plaintiff's growing sense of frustration was apparently shared by Mina and Hairston. Around the time of Plaintiff's e-mail to Feeney, both of them complained to Anastasiadis that Plaintiff's management style was unprofessional and domineering; Mina further alleged that Plaintiff's failure to communicate effectively was adversely affecting his team's ability to serve clients.  MSJ Ex. 5 at 3.

In response to Plaintiff's e-mail to Feeney, Anastasiadis convened and mediated another meeting between Plaintiff and Hairston on June 26.  According to Plaintiff, at that meeting, Anastasiadis told Plaintiff and Hairston that "she expected us to be able to work together," and that "if things didn't get better . . . it would go to HR" and Hairston would likely be transferred off of Plaintiff's team.  MSJ Ex. 4 at *25.

Anastasiadis's performance at the June 26 meeting failed to satisfy Plaintiff, who left feeling unsupported in his role as supervisor.  According to Anastasiadis, Plaintiff's exasperation boiled over in a meeting she had with him the next day, June 27.  While it is unclear what was discussed at that meeting,[2] Anastasiadis claims that Plaintiff behaved inappropriately.  More specifically, she

---

[2] The record does not disclose what was discussed at the June 27 meeting, but an e-mail from Anastasiadis to Plaintiff a few days earlier suggests that she intended to use the meeting "to address chain of command and coming to me first for problem resolution, things are usually addressed at the

claims he "act[ed] in a condescending manner towards me, was disrespectful and spoke in a very aggressive manner"—observations that mirrored reports from Mina and Hairston regarding Plaintiff's demeanor.  MSJ Ex. 5 at 4.  Plaintiff disputes Anastasiadis's account of their June 27 meeting and claims that his demeanor was professional at all times.

By early July, with no signs of improvement in Plaintiff's relationship with Mina and Hairston, Anastasiadis decided it was time to enlist HR in the effort to broker peace.  Accordingly, Plaintiff, Lowe-Miller, and Anastasiadis met once on July 8 and three times on July 14.  At the first of the three July 14 meetings, Anastasiadis, Lowe-Miller, and Plaintiff discussed Plaintiff's perceived lack of support and his behavior during the June 27 meeting with Anastasiadis.  At the second and third meetings, Lowe-Miller, Anastasiadis, and Plaintiff met with Hairston and Mina, respectively.  Lowe-Miller described those meetings as "counseling sessions" for Hairston and Mina, both of whom were to "receive documentation . . . with regards to what it is that was expected of them."  MSJ Ex. 8 at *14.  This documentation was to be based on written feedback from Plaintiff.

Anastasiadis and Plaintiff remember the July 14 meetings differently.  According to Anastasiadis, the meetings "seemed to be positive . . . we agreed that we would work together as a team in the future [and] seemed to be able to resolve the issues."  MSJ Ex. 5 at 5.  Where Anastasiadis saw a productive discussion, Plaintiff saw another missed opportunity to punish Hairston and Mina.  Regarding the documentation that was to come out of the meeting, Plaintiff said "we were going to submit our feelings about the meeting or what we thought needed to be heard to [Anastasiadis]" who would then "draw up a memo or something."  MSJ Ex. 4 at *44–45.

---

unit end."  MSJ Ex. 4 at *90.  In other words, it appears that Anastasiadis intended to tell Plaintiff to take greater responsibility for resolving personnel issues—hardly the support that Plaintiff felt he deserved.

Plaintiff described this process as "kind of prolonging the issue and not coming to a resolution." *Id.* at *45.  He therefore decided to take a different approach.

On the evening of July 14, Plaintiff sent an e-mail to Barry McLaughlin, Director of Human Resources, and copied Anastasiadis.  In that e-mail, he vented his frustration with what he saw as a lack of support and alleged for the first time that he was a victim of sex discrimination.  As Plaintiff put it:  "This message is to inform you of my concern that I am being discriminated against because I am a man. . . . [E]veryone who is critical of my supervision of Ms. Mina and Ms. Hairston are women."  *Id.* at *92.  Anastasiadis reacted to Plaintiff's e-mail with exasperation, writing that night in an e-mail to Lowe-Miller, "I have tried to work with Orlando to resolve these issues and be supportive but now the accusations of discrimination."  Resp. Ex. E at 75.  McLaughlin replied to Plaintiff the same evening and suggested he meet with H.R. to discuss his concerns.  The following day, Plaintiff declined McLaughlin's offer, and, citing his recent experience, expressed his belief that further discussion would prove futile.  McLaughlin offered to meet with Plaintiff if he changed his mind and encouraged him to follow-up on the July 14 meetings by "provid[ing] written feedback" to Lowe-Miller and Anastasiadis.  MSJ Ex. 4 at *91.  McLaughlin further advised Plaintiff to "[g]ive Catina the opportunity to prepare the memo, then consider your steps for resolution."  *Id*.  Instead, on July 16, Plaintiff filed a complaint with Pennsylvania Human Relations Commission (PHRC) in which he alleged that Hairston and Mina were treated better than he was because "I received criticism and they were favored" by "women in management positions . . . because they were women."  MSJ Ex. 11 at 3.

On or around Wednesday, July 30,[3] Plaintiff had a tense meeting (or meetings) with Mina in his office.  Mina later described "arguing back and forth" with Plaintiff after trying to "state [her]

---

[3] Samuel Nelson, another of Plaintiff's direct reports, overheard the aftermath of a meeting that he believes took place on Wednesday, July 30.  Mina describes a tense confrontation with Plaintiff on

side" of an issue.  MSJ Ex. 2B at 1.  According to Mina, this interaction "put me in tears."  *Id.*

Samuel Nelson, Mina's co-worker and one of Plaintiff's direct reports, overheard the aftermath of

Mina's meeting with Plaintiff.  He claims that Mina was "furious" when she exited Plaintiff's

office, that she slammed the door, and "ever so loudly" said "I'm going to get that bastard fired, I

promise I'm going to get him fired."  Resp. Ex. D at 10.

August 1 marked the beginning of the end of Plaintiff's tenure as TCM Supervisor.  The

previous evening, in anticipation of a two-day absence from work the following week, Mina sent an

e-mail to Plaintiff and her teammates in which she provided an update on four of her more

challenging clients.  Regarding one of those clients, KM, Mina wrote:

> She has been using PCP a lot.[4]  Stopped going to D&A program and swears she is
> fine.  I will be meeting her on Friday [August 1].  Only concern with her is an
> overdoes [sic] or getting into legal trouble.  I will inform her tomorrow that I will be
> gone and give her the office number.

MSJ Ex. 4 at *93.

COMHAR acts as a representative payee for some of its clients, including KM.  In this

capacity, it receives clients' entitlement benefits and disburses funds to those clients over the course

of the month.  Per a previous agreement that Mina had reached with KM, KM was to have received

a portion of her monthly benefits payment on August 1.  On the morning of August 1, KM came to

Defendant's office and asked for her money.  This happened some time before 9:15, when Mina

arrived at work.  Maggie Wiernicki, a clerical worker, notified Plaintiff of KM's presence and asked

Plaintiff if, in Mina's absence, he would be willing to bring KM her funds.  Plaintiff agreed and

---

Thursday, July 31.  Given the apparent infrequency with which Plaintiff met individually with
direct reports, it appears likely that Mina and Nelson were referring to the same meeting.

[4] Heavy use of PCP is a serious cause for concern, which should be self-evident to a social services
professional.  According to the National Institute on Drug Abuse, "PCP is an addictive drug; its use
often results in psychological dependence, craving, and compulsive behavior. . . and users often
become violent or suicidal. . . High doses of PCP can cause seizures, coma, and even death."
National Drug Intelligence Center, *PCP Fast Facts* (2003).

handed over KM's benefits allotment without first contacting Mina.  When Mina arrived a short time later, she expressed dismay at Plaintiff's actions, faulted him for not calling her before surrendering funds to a client who had recently relapsed, and worried that KM was "going to take that money and go off and overdose on drugs."   MSJ Ex. 4 at *61.  The interaction ended with Plaintiff promising to have Nelson check on KM the following day, and Mina going off in search of her client.

The incident with KM first came to Anastasiadis's attention on Saturday, August 2, when Mina sent her an e-mail the subject line of which read "Supervisor Help…Again (sorry)."  MSJ Ex. 2B at 1–2.  In that e-mail, Mina referred to the events of the previous day as an incident "of major concern," and labeled Plaintiff's failure to call her before distributing funds to KM as "another prime example of no communication."  *Id.* at 2.  Mina went on to describe Plaintiff's team as hamstrung by confusion and miscommunication regarding Case Manager vacation schedules and stated that she did not "feel comfortable leaving my team members with my case load for my short vacation," apparently because she was unsure who would be in the office to cover for her.  *Id.*

Anastasiadis responded to Mina that evening, thanking her for voicing her concerns.  Anastasiadis then forwarded Mina's e-mail to her supervisor, Feeney, and to Lowe-Miller in HR.  Feeney responded later that night, writing:

> I am requesting we pull [Plaintiff] off the schedule until we can evaluate this further.  Clearly the team is not functioning and it has become unhealthy and affecting their work.  And if in fact he gave a consumer [(i.e., KM)] money that was at risk with poor knowledge than [sic] I am even more concerned.

*Id.* at 1.

On Thursday, August 7, Anastasiadis and Feeney met with Plaintiff to discuss the incident with KM.  Plaintiff's position at this meeting was that he had done nothing wrong:  "I wanted to make it clear, I made no decision to give [KM] her money.  You know, I was asked to" give KM her money by Wiernicki, the administrative clerk.  MSJ Ex. 4 at *63.  According to Feeney,

9

Plaintiff also faulted Mina for failing to adequately warn him about KM's recent relapse and risk of overdose, and claimed that, had he been adequately apprised of KM's situation, he would have withheld her funds.  MSJ Ex. 2 at 3.

The following day, August 8, Plaintiff was called into Anastasiadis's office where Lowe-Miller informed him that he was suspended effective immediately.  Anastasiadis assumed Plaintiff's responsibilities during his suspension.  While Anastasiadis was filling in for Plaintiff, she and Feeney claim that she uncovered additional examples of Plaintiff's mismanagement, including his failure to regularly meet with his direct reports and to follow through on administrative tasks that Anastasiadis had directed him to complete.  MSJ Ex. 2 at 4; Ex. 5 at 7–8.  Anastasiadis catalogued these and other instances of Plaintiff's poor performance in a memo to HR Director McLaughlin, dated August 27.  On September 2, Plaintiff was terminated.

Some time thereafter, the PHRC issued a finding of "No Probable Cause" with respect to Plaintiff's claims for retaliation and wrongful termination.  MSJ Ex. 4 at *94.  With respect to the former claim, the PHRC found that Plaintiff "failed to show a causal connection between [his] participation in protected activity and his suspension and/or discharge." *Id.* at *96.  More specifically, the PHRC concluded that Plaintiff's distribution of funds to KM, not his filing of a PHRC complaint, was the proximate cause of his termination. *Id.*  With respect to Plaintiff's discriminatory discharge claim, the PHRC concluded that Defendant had articulated legitimate, non-discriminatory reasons for its actions and that Plaintiff failed to show that the proffered reasons were pretextual. *Id.*  Finally, the PHRC noted that, from 2012 through 2014, Defendant "discharged five employees in supervisory and higher level positions for similar reasons as was [Plaintiff] (i.e., poor judgment, poor communication, etc.).  All terminated employees were female." *Id.*

Having exhausted his administrative remedies before the PHRC, Plaintiff filed this action. Before me now is Defendant's Motion for Summary Judgment. For the reasons below, that motion is granted and Plaintiff's claims are dismissed.

## II.     STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). On such a motion, "'[a]ll reasonable inferences from the record must be drawn in favor of the nonmoving party' and the court 'may not weigh the evidence or assess credibility.'" *Goldenstein v. Repossessors Inc.*, 815 F.3d 142, 146 (3d Cir. 2016) (alteration in original) (citation omitted). But if the nonmoving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial," there is no genuine issue of any material fact and the moving party is entitled to summary judgment. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986).

## III.     DISCUSSION

Under Title VII of the Civil Rights Act of 1964 (Title VII), employers cannot discriminate against their employees "because of . . . sex." 42 U.S.C. § 2000e–2(a)(1). Title VII also contains an anti-retaliation provision that protects employees from adverse action based on their "oppos[ition to] any practice made . . . unlawful" by Title VII. § 2000e-3(a).

Plaintiff brings Title VII claims alleging both sex discrimination and retaliation. He also brings closely related claims under the Pennsylvania Human Relations Act (PHRA). "A plaintiff's burden when pursuing a PHRA claim is similar to his burden when pursuing a Title VII claim. 'Generally, claims brought under the PHRA are analyzed under the same standards as their federal

counterparts.'"  *Mason v. Se. Pa. Transp. Auth.*, 134 F. Supp. 3d 868, 872–73 (E.D. Pa. 2015)

(quoting *Kroptavich v. Pa. Power & Light Co.*, 795 A.2d 1048, 1054 (Pa. Super. Ct. 2002)).

### A.  Sex Discrimination: Discriminatory Termination

Lacking direct evidence that he was fired because he is male, Plaintiff attempts to prove

through indirect evidence that his firing was motivated by discriminatory animus.  Indirect evidence

claims like Plaintiff's are analyzed under the three-step framework first articulated in *McDonnell*

*Douglas Corp. v. Green,* 411 U.S. 792 (1973):

> First we ask whether the plaintiff has stated a prima facie case of discrimination . . . ; if []he
> has, we ask whether the employer has advanced a legitimate reason for its conduct; and
> finally we give the plaintiff an opportunity to prove that the employer's proffered reason is
> pretextual.

*Jones v. Se. Pa. Transp. Auth.*, 796 F.3d 323, 325–26 (3d Cir. 2015).

### 1.  Plaintiff's Prima Facie Case of Discriminatory Termination

To state a prima facie claim of sex discrimination, Plaintiff must establish four elements:

> (1) that [he] is a member of a protected class; (2) that he was qualified for the
> position; (3) that he suffered an adverse employment action; and (4) that the action
> occurred under circumstances that give rise to an inference of unlawful
> discrimination.

*Mason*, 134 F. Supp. 3d at 873.  For purposes of Defendant's Motion for Summary Judgment, the

first three elements of the prima facie case are not in dispute.

Regarding the fourth element, Plaintiff need only demonstrate that the facts of this case are

"compatible with discriminatory intent—i.e., that discrimination *could* be a reason for the

employer's action."  *Marzano v. Comput. Sci. Corp. Inc.*, 91 F.3d 497, 508 (3d Cir. 1996).  The

Third Circuit has "held on numerous occasions" that "this initial burden is not intended to be

onerous."  *Id*.  Thus, to show that he was terminated "under circumstances that give rise to an

inference of unlawful discrimination," Plaintiff merely needs to show that "he ultimately was

replaced by a person outside the protected class," i.e., a woman. *Id.* at 503 (quoting *Chipollini v. Spencer Gifts, Inc.,* 814 F.2d 893, 897 (3d Cir.), *cert. dismissed*, 483 U.S. 1052 (1987)).  This he has done.  Plaintiff's replacement as TCM Supervisor, Anya Lightner, is female; therefore Plaintiff has established a prima facie case of discriminatory termination.

### 2.  Defendant's Legitimate, Non-Discriminatory Reasons for Plaintiff's Termination

In the second step of the *McDonnell Douglas* framework, the burden shifts to Defendant to put forth a legitimate, non-discriminatory reason for firing Plaintiff.  Defendant easily carries this burden by pointing to, among other things, Plaintiff's inability to resolve or alleviate his conflicts with Mina and Hairston; his brusque and unprofessional demeanor during the June 27 meeting with Anastasiadis; his failure to provide Anastasiadis with requested paperwork; his inability to communicate effectively with his staff regarding client issues and staff deliverables; his lapse in clinical judgment in distributing funds to KM, a client he knew had recently relapsed; and his failure to acknowledge any responsibility for his role in placing KM at risk.

### 3.  Plaintiff's Claim that Defendants Proffered Reasons are Pretextual

To survive summary judgment, Plaintiff must show that Defendant's proffered legitimate, non-discriminatory reasons for his termination were pretextual.  Plaintiff can establish pretext under two theories.  He can either "provide evidence that allows the factfinder to infer that discrimination was more likely than not a motivating or determinative cause of the adverse employment action," or, alternatively, he can "present evidence that casts sufficient doubt upon each of the legitimate reasons proffered by the defendant so that a factfinder could reasonably conclude that each reason was a fabrication." *Atkinson v. LaFayette Coll.*, 460 F.3d 447, 454 (3d Cir. 2006).

#### a.  Discrimination as a Motivating or Determinative Cause

To succeed on the first theory, Plaintiff must point to evidence "from which a factfinder could reasonably conclude that the defendant's proffered reasons were fabricated." *Fuentes v. Perskie*, 32 F.3d 759, 764 (3d Cir. 1994). Plaintiff attempts to do this in two ways: through the use of comparators to prove disparate treatment and through a cat's paw theory of liability.

i.     Disparate Treatment

Plaintiff claims that discrimination can be inferred from the fact that Defendant treated its employees more favorably than it treated him. Specifically, Plaintiff maintains that (1) Mina and Hairston were spared any disciplinary action, while Plaintiff was terminated for failing to resolve his conflict with them, and that (2) Wiernicki was not terminated even though she was partially responsible for the disbursement of funds to KM and had previously distributed funds to clients without proper authorization.

"When using comparators to establish pretext, plaintiff must show that the individuals engaged in the same conduct as him and that they shared in common all relevant aspects of his employment." *Ade v. KidsPeace Corp.*, 698 F. Supp. 2d 501, 514 (E.D. Pa.), *aff'd*, 401 F. App'x 697 (3d Cir. 2010). Plaintiff's comparator-based theory fails because the conduct he attributes to Mina, Hairston, and Wiernicki differed materially from the conduct that led to his termination.

In broad terms, one might argue that Mina and Hairston engaged in the same conduct as Plaintiff insofar as all three failed to work together effectively and repeatedly complained about the situation to Anastasiadis. But unlike Mina and Hairston, Plaintiff was a **supervisor**; an integral part of his job was to manage the employees reporting to him in an effective way. Plaintiff was fired because he regularly failed to meet individually with his team members and failed to establish clear lines of communication with his team—supervisory duties that were not assigned to Mina and Hairston. Furthermore, to the extent that Mina, Hairston, and Plaintiff engaged in the same

14

conduct, the record shows that they were treated in the same way: all three met repeatedly with Anastasiadis and Lowe-Miller, were given an opportunity to discuss their difficulties, and were told, essentially, to work it out.[5]

Plaintiff's comparison to Wiernicki is similarly unavailing. For starters, Wiernicki merely asked Plaintiff to disburse funds to KM, she did not disburse the funds herself. Because Wiernicki was an administrative employee and not a supervisor, Plaintiff retained the final say in the matter and could have declined her request to distribute funds to KM until he checked in with Mina. In my view, the notion that his conduct, as team supervisor, is excused because he acted in response to a request from an administrative aide calls into question his judgment as a supervisor. Furthermore, Wiernicki's conduct appears less culpable than Plaintiff's because she was not copied on Mina's e-mail and thus did not know of KM's recent relapse and risk of overdose.

Plaintiff also attempts to demonstrate disparate treatment based on two previous incidents in which Wiernicki was disciplined, but not terminated, for distributing client funds without proper authorization from the relevant Case Manager. However, the incidents referenced by Plaintiff differ substantially from Plaintiff's distribution of funds to KM. On one occasion, rather than disburse client funds to a case manager as requested, Wiernicki used her own money to purchase towels for a client. On another occasion, when an elderly client was too infirm to climb the steps to Defendant's office, Wiernicki disbursed the client's funds to the client's roommate who had frequently accompanied the client during past office visits. While both of these incidents were breaches of Defendant's protocol, these incidents were not identical or substantially similar to Plaintiff's

---

[5] Plaintiff claims that Defendant's failure to discipline Hairston and Mina somehow supports a free-standing sex discrimination claim. As an initial matter, Plaintiff never explains the legal basis for this claim. Moreover, the record makes clear that Defendant did require Hairston and Mina to attend multiple counseling sessions with Anastasiadis and eventually with Lowe-Miller. Plaintiff believed these meetings were insufficient responses to Mina and Hairston's insubordination, but he offers no explanation as to why Title VII mandated the punitive approach that he favored.

conduct because neither even approaches the gravity of a knowing disbursal of funds to a recently relapsed drug user.  These distinctions aside, Plaintiff's attempt to use Wiernicki as a comparator is unpersuasive because Plaintiff was fired not just for his role in the incident with KM, but for that combined with his other failings as a TCM Supervisor.

When Defendant's treatment of Plaintiff is compared with its treatment of similarly situated supervisory employees, Plaintiff's disparate treatment claim appears weaker still.  As noted by the PHRC, from 2012 through 2014, Defendant fired five other employees in supervisory positions who, like Plaintiff, allegedly exhibited poor judgment and failed to communicate effectively; all of these terminated employees were women.  Moreover, Plaintiff appears to concede that Anastasiadis did not treat the two female supervisors who reported to her any differently than she treated him.  When asked during his deposition whether he could "point to any treatment that Catina gave [her other two direct reports] that was more favorable than the treatment that you got from Catina," Plaintiff responded:  "No, not specifically.  And I'm stating that -- no I can't."  MSJ Ex. 4 at *55.

On this record, no reasonable finder of fact could conclude that Defendant's disparate treatment of male and female employees gives rise to the inference that discriminatory animus played a motivating or determinative role in Plaintiff's termination.

ii.     Cat's Paw Theory of Liability

Under a cat's paw theory of liability, "an employer may be liable for employment discrimination if the source of illegal animus was not the final employment decision-maker but rather another employee whose animus proximately caused the adverse employment action at issue in the case."  *Mason*, 134 F. Supp. 3d at 873–74.  To prevail on a cat's paw theory, Plaintiff must establish that:

> one or more of his nonsupervisory coworkers: (1) performed an act motivated by
> discriminatory animus; (2) the act was intended by the coworker to cause an adverse

employment action; (3) that act is a proximate cause of the ultimate employment action; and either (a) defendants acted negligently by allowing the co-worker's acts to achieve their desired effect though they knew (or reasonably should have known) of the discriminatory motivation; or (b) the coworker was aided in accomplishing the adverse employment action by the existence of the agency relation.

*Burlington v. News Corp.*, 55 F. Supp. 3d 723, 738–39 (E.D. Pa. 2014) (internal citations omitted).

Plaintiff's cat's paw theory is based on Mina's role in his termination.  Specifically Plaintiff claims that Mina *falsely* reported that KM was missing as of Saturday afternoon, that Defendant accepted Mina's report without conducting an adequate, independent investigation, and that Mina's "missing client" report was the proximate cause of his termination.

Accepting for purposes of argument Plaintiff's version of events, his cat's paw theory still fails because there is no evidence Mina was motivated by discriminatory animus.  Plaintiff's only evidence of Mina's alleged anti-male bias is the statement attributed to Anastasiadis, that Mina's and Hairston's objections to Plaintiff's hire "seemed to be about the men."  Resp. Ex. B at 40.[6] Anastasiadis's personal opinion about Mina's purported state of mind has little if any probative value, and hardly suffices as evidence of discriminatory animus.  It therefore does nothing to advance Plaintiff's claim.

Significantly, nothing else in the record suggests that Mina was motivated by discriminatory animus.  While Kelli Siebert claimed that Hairston didn't "like men" and "treated all men like crap," Resp. Ex. A at 13, none of Mina's co-workers offered testimony suggesting that Mina had a similar anti-male bias.  And while Mina's threat that "I'm going to get that bastard fired" demonstrates that she strongly disliked Plaintiff, the Third Circuit has warned that "an unfortunate and destructive conflict of personalities does not establish sexual discrimination."  *Ezold v. Wolf, Block, Schorr & Solis-Cohen*, 983 F.2d 509, 544 (3d Cir. 1992).

---

[6] Anastasiadis denies ever having uttered this statement.

17

Because Plaintiff fails to establish that Mina acted with discriminatory animus, his cat's paw theory cannot succeed.

> b. *Plaintiff's Claim that Defendant Fabricated its Legitimate Non-Discriminatory Reasons for His Termination*

Plaintiff next asserts that Defendant's proffered nondiscriminatory reasons for firing him were mere fabrications. To survive summary judgment on this theory, Plaintiff must demonstrate, by a preponderance of evidence, "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its actions that a reasonable factfinder could rationally find them unworthy of credence." *Fuentes*, 32 F.3d at 764–65. In doing so, Plaintiff "must show not merely that the employer's proffered reason was wrong, but that it was so plainly wrong that it cannot have been the employer's real reason." *Atkinson*, 460 F.3d at 454. In other words, "[t]he question is not whether the employer made the best, or even a sound, business decision; it is whether the real reason is discrimination." *Id.*

According to Plaintiff, Defendant fired him because he distributed funds to KM and because KM subsequently went missing for a period of days. Plaintiff makes three arguments as to why these non-discriminatory reasons for termination lack credence: 1) he could not have been fired for giving funds to KM because he had no way of knowing that KM was at risk of an overdose; 2) his disbursal of funds to KM could not have been the cause of his termination when he was not authorized to withhold those funds; and 3) he could not have been fired because KM went missing for several days because KM's whereabouts were known to COMHAR one day after she received her funds from Plaintiff.

In making his first argument, Plaintiff attempts to deflect blame on to Mina for failing to adequately notify him about KM's risk of overdose. According to Plaintiff, Mina's e-mail of July 31 was not "specifically a warning" about KM because it mentioned not just KM, but three other

18

clients who "may appear" during Mina's scheduled vacation.  Resp. at 13.[7]  On its face, this is an

extraordinarily weak excuse on the part of a social service professional dealing with potentially life-

threatening issues.  Furthermore, Plaintiff's own testimony undermines his claim that Mina failed to

put him on notice of KM's risk of overdose.  When asked whether he understood from Mina's e-

mail that KM was "at risk," Plaintiff responded that he "[u]nderstood she was using, yes."  Resp.

Ex. B at 54.  And when asked whether Mina had expressed concerns about a risk of an overdose,

Plaintiff answered that "[a]nytime someone's using drugs, that's the concern."  *Id*.  Finally, while

Plaintiff attempts to downplay the significance of Mina's e-mail by pointing out that "there were

other names mentioned" in it, he also understood that Mina's express purpose in sending the e-mail

was to warn team members about clients who "might end up . . . in a crisis" during her forthcoming

absence.  *Id*.  Given that Plaintiff knew Mina was using drugs, knew that the risk of overdose is a

concern "anytime someone's using," and knew that KM might end up "in crisis" in the near future,

Plaintiff's failings as a supervisor are self-evident.

      Plaintiff's next argues that he could not have been fired for failing to withhold funds from

KM because he was not permitted to do so.  Tellingly, none of the evidence that Plaintiff musters in

support this argument actually speaks to his authority to withhold funds from an at-risk client.

Though Plaintiff claims that COMHAR regularly disbursed funds to clients who were struggling

with addiction,[8] he cites no other instances in which it made payments to recently-relapsed clients

---

[7] Plaintiff also notes that Mina should have been in the office by 9:00 a.m. on the morning of
August 1, when KM arrived looking for her check.  While it appears that Mina's tardiness was a
contributing factor in the incident with KM, as a supervisor, Plaintiff's responsibility was to fill
such gaps.

[8] This is hardly surprising given that Defendant's clients are drawn from the ranks of the mentally
ill, a population that is particularly prone to substance abuse.  *See* Nat'l Inst. Of Health,
*Comorbidity: Addiction and Other Mental Illness*, 2 (rev. Sept. 2010), https://tinyurl.com/NIH-
Report ("Many people who regularly abuse drugs are also diagnosed with mental disorders and vice
versa.  The high prevalence of this comorbidity has been documented in multiple national
population surveys since the 1980s.")

who were flagged as being at risk for an overdose.  Similarly, while Nelson and Siebert testified that client consent was required before Defendant could use client funds to make a purchase or vary the schedule on which client funds were disbursed, neither witness addressed temporary withholding of benefits in an emergency.  By contrast, Anastasiadis maintains that TCM Supervisors not only necessarily possess the authority to temporarily withhold benefits, but that one had exercised that authority in the recent past.[9]  Moreover, Michelle Feeney claims that during her August 7 meeting with Plaintiff and Anastasiadis, Plaintiff admitted that he would have withheld funds from KM had he understood the danger that she was in.  MSJ Ex. 2 at 3.

Even less convincing is Plaintiff's third argument—that KM's whereabouts were known to Defendant by August 2, and that Plaintiff could therefore not have been fired because KM went missing for a period of several days.  As an initial matter, nothing in record shows that Defendant fired Plaintiff because KM went missing *for several days*.  On the contrary, when Michelle Feeney first heard on August 2 of the incident with KM, she worried that the "team is not functioning" and cited Plaintiff's decision to give funds to KM as a cause for additional concern.  MSJ Ex. 2b at 1.  These factors, not KM's whereabouts, led Feeney to announce that she would be "requesting we pull [Plaintiff] off the schedule."  *Id*.  And while Plaintiff claims that Feeney and McLaughlin both informed him that a "missing client incident" contributed to Defendant's decision to terminate him, Plaintiff does not dispute that KM failed to show up for her previously scheduled meeting with Mina on August 1, failed to return Mina's calls that afternoon, and was therefore "missing," if only for a day.[10]

---

[9] According to Anastasiadis, from 2011 until early 2014, at least one TCM Supervisor temporarily withheld client benefits after determining that the client was using drugs.  Resp. Ex. E at 40–41.

[10] Plaintiff believes it significant that Nelson visited KM on the morning of Saturday, August 2, and reported that she appeared "stable," Resp. Ex. D at 19, though she had "admitted to smoking PCP on the previous Thursday" and "possibly was intoxicated" that morning, Reply Ex. 20–A.  In

Finally, in claiming that he was fired solely because he disbursed funds to KM, Plaintiff ignores the backdrop against which that incident occurred.  The record demonstrates that well before August 1, Defendant had reason to doubt Plaintiff's fitness as a TCM Supervisor.  Defendant credibly asserts that the incident with KM aggravated its pre-existing concerns about Plaintiff's ability to communicate effectively both with his team and with his supervisors.  For instance, Defendant notes that a simple phone call to Mina would have alerted Plaintiff to the danger of disbursing funds to KM.  It further asserts that Plaintiff's failure to make that call was inexcusable in light of Mina's warning—delivered by e-mail the night before—that KM was at risk of an overdose.  Defendant also observes that Plaintiff never notified his supervisor of the incident with KM, and that it was only after Mina communicated the following day that Anastasiadis learned that a client's safety may have been compromised.  Finally, Defendant points out that Plaintiff steadfastly refused to acknowledge that he erred by disbursing funds to KM.  According to Defendant, this failure to assume responsibility for what it considered to be a serious lapse of clinical judgment cinched its determination that Plaintiff was unfit for the role of TCM Supervisor.

On this record, I find that Plaintiff has not exposed any weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in COMHAR's version of events that would allow a reasonable fact-finder to conclude that it fabricated its legitimate non-discriminatory reasons for firing Plaintiff.  This, coupled with Plaintiff's failure to prove that discrimination was an animating purpose for his termination, disposes of Plaintiff's Title VII and PHRA sex discrimination claims.  Summary judgment will be granted.

---

highlighting Nelson's assessment, Plaintiff seems to argue that Mina's concerns about KM were unfounded since KM did not in fact overdose.  This no-harm-no-foul argument misses the mark. Defendant does not claim that Plaintiff was fired because KM overdosed; rather it claims that Plaintiff was fired because his decision to disburse funds to a recently relapsed addict showed poor clinical judgment.  Nelson's report from August 2 reinforces the credibility of Defendant's legitimate nondiscriminatory reason.

**B.  Retaliation**

Like sex discrimination claims, Title VII Retaliation claims are analyzed under the three-step burden-shifting framework of *McDonnell Douglas*.  "To establish a *prima facie* case of retaliation under Title VII, a plaintiff must tender evidence that: (1) she engaged in activity protected by Title VII; (2) the employer took an adverse employment action against her; and (3) there was a causal connection between her participation in the protected activity and the adverse employment action."  *Moore v. City of Philadelphia*, 461 F.3d 331, 340–41 (3d Cir. 2006).  If the plaintiff makes out a prima facie case of retaliation, the defendant must advance a legitimate, non-retaliatory reason for its conduct, "and, if it does so, the plaintiff must be able to convince the factfinder both that the employer's proffered explanation was false, and that retaliation was the real reason for the adverse employment action."  *Id.* at 342.  To meet this burden, Plaintiff must prove Defendant's retaliatory motive was the "but-for" cause of his termination.  *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 133 S. Ct. 2517, 2533 (2013).

Plaintiff indisputably engaged in protected activity when he e-mailed Barry McLaughlin stating his "concern that I am being discriminated against because I am a man" and when, two days later, he filed a complaint with PHRC.  It is likewise undisputed that Plaintiff suffered an adverse employment action when he was terminated.  The parties contest whether Plaintiff has established the requisite element of causation, but that issue need not detain me here.  Assuming for the sake of argument that Plaintiff has established a prima facie case of retaliation, his claim still fails because he does not carry his burden at step three of the *McDonnell Douglas* framework.

Plaintiff's argument as to why retaliation was the but-for cause of his termination duplicates almost exactly his argument as to why sex discrimination was a motivating or determinative cause of his termination; I therefore see no reason to repeat my earlier analysis.  For the same reasons that Plaintiff failed to demonstrate that Defendant's proffered legitimate reasons for termination were a

pretext for sex discrimination, I find that Plaintiff cannot carry his burden of proving that Defendant fired him out of retaliation.[11]  Defendant's Motion for Summary Judgment is therefore granted as to Plaintiff's Title VII retaliation claim and related claims under the PHRA.

**IV.     CONCLUSION**

Defendant's Motion for Summary Judgment is GRANTED and Plaintiff's claims are dismissed.  An appropriate Order follows.


                              /s/ Gerald Austin McHugh
                              United States District Judge

---

[11] Plaintiff proffers one additional piece of evidence to support his retaliation claim:  Anastasiadis's July 14 e-mail to Lowe-Miller where she wrote "I have tried to work with Orlando to resolve these issues and be supportive but now the accusations of discrimination."  Resp. Ex. E at 75.  This remark is temporally distant from Plaintiff's termination.  In context, couched as a lament after reference to her many attempts at counseling, it is also fairly weak evidence of retaliatory intent.  Whatever probative force Anastasiadis's e-mail has, it would not suffice to establish retaliation as the but-for cause of Plaintiff's firing.